KANSAS CITY SOUTHERN RAILWAY COMPANY v. SECOND STREET IMPROVEMENT COMPANY, Appellant.

**Division One, April 2, 1914.**

1. **CONDEMNATION: Right of Plaintiff to Maintain: Estoppel.** The landowner who takes down the award of damages made by the commissioners and paid into court for him by plaintiff, cannot thereafter, so long as he retains said money, question plaintiff's right to condemn the property. He is estopped thereby.

2. ———: **Damages: Value of Improvements: Constructed by Consent of Landowner.** In the condemnation of land for railroad purposes, the landowner is not entitled, as a part of his damages, to the value of improvements, such as a roundhouse, turntables and railway tracks, placed thereon by the plaintiff railroad company in pursuance to the consent of the landowner, under an expired lease for ten years with an option to buy. Although the lease had expired when the condemnation suit was brought, the improvements did not, as to the condemning railroad, become a part of the realty, and they did not belong to the landowner, and he is not to be allowed damages for any part of their value.

3. ———: ———: **Value of Other Improvements.** In the condemnation proceeding brought by a railroad company, after the expiration of a lease, the value of a house erected thereon, by the consent of the landowner, during the life of the lease, for the pleasure, recreation and edification of the railroad employees, largely out of the private funds of the railroad president, should not be taken into consideration as a part of defendant's damages.

4. ———: ———: **Date of Valuation: As Determined by Defendant's Instruction.** Where the railroad company and the landowner both asked the court to instruct the jury to fix the landowner's damages for the property taken at what was its value on the date the commissioners returned their assessment into court, the landowner cannot be heard to complain that the court refused another instruction asked by him directing them to determine the value of the property as of the day the condemnation suit was filed.

5. ———: ———: ———: **Date When Report is Returned and Assessment Paid.** As a general rule the date of the taking of property for a public purpose is the date the commissioners make their report of damages and their award is paid into court, and in a subsequent trial by a jury the inquiry should be as to what its value was on that date. And where the relation of landlord and tenant existed between the plaintiff and landowner up to the time the condemnation suit was instituted, there is no reason for varying the rule to some other date.

6. ———: **Measure of Damages: Elevator and Switching Facilities.** Where the railroad company during the existence of a lease of the land it is trying to have condemned, had constructed switch tracks thereon right up to defendant's elevator, the defendant can recover for the value of the property taken and any damage that may result from such taking to

the elevator and ground upon which it stands, but it cannot recover damages on the theory that it will not be furnished reasonable switching facilities after such condemnation, for the law requires the railroad company to furnish such facilities and affords defendant an action for failure to provide them; and it was not error to give an instruction for plaintiff telling the jury the railroad company was bound by law to furnish such switching facilities and not to allow defendant damages in the belief that defendant was or in the future would be deprived of such switching facilities.

7. ———: ———: Evidence: Commissioners' Report. The report of the commissioners appointed to assess the damages to the landowner whose property is taken in the condemnation proceeding is not competent in an inquiry as to the damages before a jury. Nor should their award be placed before the jury in an indirect way; for instance, by asking one of the commissioners, called as a witness, to examine the report for the purpose of refreshing his recollection of what was the value of the property at the time the report was made.

8. ———: ———: ———: ———: Refreshing Memory of Expert. An expert testifies to things within his own knowledge, or gives his expert opinion upon hypothecated facts. A report made by him cannot be used to refresh his recollection. In a condemnation case tried before a jury, the prior report of the commissioners, cannot be used to refresh the recollection of one of them called as an expert on land values.

9. ———: ———: ———: ———: ———: Waiver. Where the landowner objected to the use of the commissioners' report to refresh the recollection of one of them called as an expert witness on land values, he does not waive his right to object to a ruling permitting the report to be used for that purpose and thereby getting the amount of the commissioners' award before the jury, by silently acquiescing to a statement made by the court to the effect that it is admitted the report is competent evidence—the report itself not being offered in evidence.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn,* Judge.

REVERSED AND REMANDED (*with directions*).

*C. A. Braley* and *E. C. Wright* for appellant.

(1) At the time of the institution of this suit there was no statutory law permitting a railroad com-

pany to condemn land merely for "tracks, sidetracks, switch tracks and like appurtenances of a railroad yard," and if there was any such law it is incumbent upon respondent to show the right has been given it in express terms or by necessary implication. Bridge Co. v. Stone, 173 Mo. 1.    (2)  If the respondent had the power to condemn any lands for the above purpose, it did not have power to condemn land outside the limits of Kansas City in excess of ten acres.  (3) Thirty or more years ago there was no need for the large and extensive yards that railroads now require, but the Legislature has not kept abreast with those requirements and has not given railroads any additional powers, except for branch railroads in the last thirty years.  At that time a right of way one hundred feet wide and a tract of land amounting to ten acres outside the city limits and six blocks within the city limits were deemed sufficient.  R. S. 1909, sec. 3049;  R. S. 1909, secs. 2369, 3067, 3069, 3073, 3215, 3216;  R. S. 1879, secs. 785, 826, 827, 900;  Laws 1870, p. 91, sec. 4;  Laws 1901, p. 98.   (4)  The plaintiff having allowed its lease to expire before it removed its improvements or instituted condemnation proceedings, they became a part of the freehold and the jury should have been allowed to consider the improvements as a part of the freehold in determining the amount of damage to which the defendant was entitled.  Walsh v. Sichler, 20 Mo. App. 380; Beckwith v. Boyce, 9 Mo. 560; Wilkerson v. Farnum, 82 Mo. 677; Burcher v. Parker, 40 Mo. 120; Morrison v. Sohn, 90 Mo. App. 76; McAllister v. Beel, 53 Mo. App. 81; Iron Works v. Hitt, 49 Mo. App. 472; Hunt v. Railroad, 76 Mo. 115; Railroad v. Bradbury, 106 Mo. App. 457; Anthony v. Rockefeller, 102 Mo. App. 326; Exchange Co. v. Realty Co., 103 Mo. App. 24.   (5)  If the other improvements should not have been considered as a part of the freehold most certainly the "Stilwell Rest" built upon this defendant's land by

Mr. Stilwell, a stranger to the title, became a part of the freehold and the court should have allowed the jury to so consider it in connection with the market value of the land condemned. Authorities above cited; also, Schaffner v. Schilling, 6 Mo. App. 42; Hunt v. Railroad, 76 Mo. 115. (6) The allegation in respondent's petition that the land belonged to or was owned by the appellant is an allegation that appellant also owned the improvements thereon that were of a permanent nature. Life Ins. Co. v. Tillery, 152 Mo. 421. (7) The railroad company having stated in its petition that the respondent was the owner of the land, is estopped to claim any improvements of a permanent nature like the ones in question. Peoria & Pekin Road v. Laurie, 63 Ill. 264. (8) Under the facts in this case, the jury should have been instructed to have considered the market value of the land, and made their assessment of damages as of October 6, 1902, instead of July 8, 1903. Regan v. Railroad, 111 Mo. 463; McElroy v. Independence Air Line, 172 Mo. 546; McReynolds v. Railroad, 110 Mo. 488; Hosher v. Railroad, 60 Mo. 303; Forsyth v. Boulevard, 127 Mo. 417; Webster v. Railroad, 116 Mo. 114. (9) The court committed reversible error in giving over appellant's objection instruction number 1, asked by respondent. Said instruction told the jury, among other things, in effect that it was the duty of the railroad to furnish the elevator with land and tracks for the storage of its cars of grain coming and going to the elevator in its daily operations. In effect, that for the exclusive use of this elevator the railroad must furnish, at the railroad's expense, land and tracks for all the elevator's business, or if anyone should build an elevator or mill adjoining a railroad track then that railroad must go out and buy lands for storage facilities. Railroad v. Mendonsa, 193 Mo. 518; Railroad v. Pfau, 212 Mo. 398. (10) The court erred in allowing commissioner E. S. Truitt to give evidence as to market

value based upon his commissioners' report and allowing J. M. Benton, a deputy county assessor, to give market values based upon tax assessments. Railroad v. Roberts, 187 Mo. 309.

*S. W. Moore, Cyrus Crane, O. W. Pratt* and *J. M. Souby* for respondent.

(1) A railroad has power to condemn such land as is necessary for sidetracks and yard purposes and the court committed no error in refusing to sustain appellant's demurrer and motion to dismiss. It is admitted by appellant that no appellate court in this State has held that a railroad was limited to ten acres for switch and yard purposes outside of the city limits. Notwithstanding these concessions, appellant, for the purpose of being enabled to put plaintiff at its mercy, contends that this condemnation cannot be maintained by reason of the infirmity of our statutes. The statutes confer on railroad companies ample powers to condemn lands both for depot purposes and for switch tracks and yard purposes and that the limitation to ten acres applies only to depots and has no application, whatever, to switch tracks and yards. State ex rel. v. Railroad, 135 Mo. 645; Wells on *Res Judicata* and *Stare Decisis,* sec. 595; Thornton v. Thornton, 27 Mo. 302; Venable v. Railroad, 112 Mo. 125; Fears v. Riley, 148 Mo. 63. (2) Under the facts in this case defendant was not entitled to claim the railroad tracks and structures, which had been placed on the land by plaintiff, inasmuch as plaintiff's entry on the land was lawful and with the consent and permission of defendant and the structures placed on the land were also with defendant's knowledge and consent. Dietrich v. Murdock, 42 Mo. 279; Hosher v. Railway, 60 Mo. 329. The landowner is not entitled to compensation for improvements even when they were erected without his consent. The courts are

unanimous in holding that he is not so entitled where they have been erected with his consent. Jones v. Railroad, 70 Ala. 227; Newgrass v. Railroad, 15 S. W. 188; Railroad v. Taylor, 24 Pac. 1027; Railroad v. Adam, 10 So. 465; Emerson v. Railroad, 75 Ill. 176; Daniels v. Railroad, 41 Iowa, 52; Railroad v. Dunlap, 11 N. W. 271; Greve v. Railroad, 1 N. W. 816; Railroad v. Whitney, 99 N. W. 525; Railroad v. Mosier, 13 Pac. 300; Justice v. Railroad, 87 Pa. St. 28; Railroad v. McLane, 28 S. W. 454; Railroad v. Stancliff, 7 Pac. 530; Railroad v. Corbett, 60 Pac. 127; Lyon v. Railroad, 42 Wis. 538. (3) In instructing the jury to make their assessment of damages as of July 8. 1903, the date of the filing of the report of the commissioners, the court correctly stated the law as applicable to this case. In re Forsyth Blvd., 127 Mo. 417; Benedict v. New York, 98 Fed. 789. (4) The court did not err in giving plaintiff's instruction numbered 1. Railroad v. Fowler, 142 Mo. 670. (5) The court committed no error in its rulings on the admissibility of evidence.

GRAVES, J.—This is a condemnation proceeding, but one with some rather unusual features. A number of parties, headed by Arthur E. Stilwell and E. L. Martin, were interested in the construction of a railroad from Kansas City, Missouri, to the Gulf of Mexico. To this end there seems to have been several companies organized, which were largely officered by the same parties, and which seem to have had a community of interest in the one project, i. e., the railroad from Kansas City to the Gulf. The railroad proper, which did not touch Kansas City, but started from Grandview, near Kansas City, was built by the Kansas City, Pittsburg & Gulf Railroad, a corporation chartered for that purpose. Getting from Grandview into Kansas City was left to other terminal companies, which were finally merged into the Kansas

City Suburban Belt Railroad. This latter was the result of a consolidation between the Consolidated Terminal Railway Company and other interests. At the same time and officered practically by the same parties was the Second Street Improvement Company, the defendant in this action. The chief duty of this land company (for such was and is the character of the Second Street Improvement Company) seems to have been to buy up the land along the proposed route of the Railroad companies, and land which said companies would have to have for construction purposes, and lease the same to the railroad companies. Accordingly in 1892 the defendant in this case bought twenty-eight acres of land in the east bottoms at Kansas City, Missouri, but outside of the city limits. On the second day of May it leased these lands to the Consolidated Terminal Railway Company, and this lease passed to the Kansas City Suburban Belt Railroad, upon the consolidation mentioned above. This lease ran for ten years, and gave to the lessee an option to purchase at stipulated prices at the end of the term, or during the term at annual periods. More of the details of this lease may be required in the course of the opinion.

During the term of this lease and pursuant to the rights conferred upon the lessee by it, the Suburban Belt Railroad erected on the land a roundhouse, turntable, machine shops and numbers of miles of railroad tracks. In 1898 the defendant, with the consent of the lessee, Suburban Belt Railroad, sold seven and one-half acres of the leased lands to the Kansas City, Pittsburg & Gulf Railroad, a matter which may become material. Adversity overtook the two railroad corporations, and by foreclosure proceedings in the Federal court the property of both was sold out, and the plaintiff in this case became the purchaser. These proceedings occurred from 1899 on, but prior to the termination of the lease. Plaintiff

operated under the lease until it expired May 1, 1902. August 12, 1902, defendant notified plaintiff to vacate, and the parties failing to agree upon a price for the purchase of the property, this suit was brought October 6, 1902. Commissioners were appointed October 22, 1902, and filed their report July 8, 1903, assessing defendants' damages at $26,000, which sum was paid into court for the defendant, and as appears from the final judgment itself, was taken down by the defendant. Exceptions having been filed to this report, and a trial by a common law jury demanded, the question of damages was again tried before a jury, which jury allowed to defendants damages in the sum of $30,000. Upon this verdict the following judgment (omitting description of the land) was entered:

"Wherefore it is considered, ordered and adjudged by the court that the defendant, Second Street Improvement Company as owner of the following described tract of land in Kansas City, Jackson county, Missouri, to wit: . . . .

"Has been and is damaged by the taking of the property above described in the sum of thirty thousand dollars, *of which said sum there has heretofore been paid by the Kansas City Southern Railway Company to said owner, the defendant, the Second Street Improvement Company, the sum of twenty-six* thousand dollars.

"Wherefore it is further ordered and adjudged by the court that the said Kansas City Southern Railway shall, within ten days from this day, pay to the defendant, the Second Street Improvement Company, herein, as owner of the said land, the sum of four thousand dollars from July 8, 1903, and the costs of this proceeding, and in default of such payment that said defendant have hereof execution, providing the said Kansas City Southern Railway Company shall not elect to abandon this proceeding, as by the statute in such cases made and provided.

"And it is further considered, ordered and adjudged by the court that upon the payment of said sum of four thousand dollars with interest as above provided to said defendant, the Second Street Improvement Company, or into the hands of the clerk of this court, for defendant, the Second Street Improvement Company, the real estate above described be and stand condemned for the purpose and uses mentioned in its petition for condemnation."

The italics are ours. This judgment the plaintiff abided, but defendant being discontent therewith, has appealed, and urges here questions not only as to the matter of damages, but also as to the right of the plaintiff to condemn at all. This fairly outlines the case.

I. Defendant presses a number of questions upon the right of the plaintiff to condemn the land involved in this action. Under the record in this case, these questions cannot be urged by the defendant. The circuit court had full jurisdiction of the subject-matter and the parties. It adjudged plaintiffs' right to condemn, and the defendant accepted the award made by the commissioners. Such fact is recited in the judgment before us. In this situation the defendant (with plaintiff's cash in its coffers) cannot gainsay the right of plaintiff to condemn. It is estopped from questioning that portion of the condemnation proceeding. The usual rule is that one who accepts the benefits of a judgment is estopped from denying the validity thereof. The law will not permit a person to blow both hot and cold. It will not permit the landowner to deny the plaintiff's right to condemn, whilst such landowner has in his pockets, what up to that point of the proceeding, is the constitutional just compensation for his property. This question we have recently been over in Chicago Great Western Railroad Co. v.

*Right to Condemnation: Estoppel.*

*Right to Condemnation: Estoppel.*

Kemper et al., *ante,* p. 279. [*Vide,* also, Railroad v. Bridge Co., 215 Mo. 286.] In fact it is only by virtue of our statutes that the owner can further litigate the question of damages after he has accepted the award made him for his land. [R. S. 1909, sec. 2364.] Under the facts and the law he is estopped from now urging that plaintiff had no right to condemn, and also estopped from urging that the judgment of the circuit court determining that plaintiff did have the right to condemn the property specified in its petition, is erroneous. That portion of the judgment is therefore affirmed. This leaves us only such questions as are urged against the judgment upon the matter of damages, and those questions we take next.

II. The preceding paragraph eliminates points 1, 2, and 3 of defendant's brief, but we are not left without trouble, because the diligence of its counsel has furnished us with ten more points numbered separately from 4 to 14, inclusive. Some of these are worthy of note, whilst others are without force. The first point urged, and this is stated in several ways under separate propositions, is that the defendant was entitled to have the jury consider the value of the improvements made on this ground, i. e., the tracks, roundhouse, turntable, etc., taken into consideration in determining the "just compensation" to which the defendant was entitled for the appropriation of the property to a public use. These improvements, made solely for railroad purposes under the consent given in the lease, are urged to be worth some $46,000, and defendant says that the trial court by excluding that item or element of damages from the jury by its instruction, has grievously wronged the defendant, although all of such improvements were put there by and with the consent of the defendant. In fact the property was leased for the

*Condemnation: Improvements Constructed by Consent: Damages.*

very purpose of putting those improvements thereon. Defendant has builded up a theory of the law more specious than sound, to the effect that inasmuch as plaintiff was its tenant, and as such tenant allowed its lease to expire without removing the improvements from the leased premises, such improvements thereupon became a part of the realty and belonged to defendant. In other words, they seek to apply the ordinary rule in cases of landlord and tenant to the situation here, leaving out of consideration that the general public has some interest in improvements made for public service.

Ordinarily an ejectment will lie for the recovery of realty owned by one party and wrongfully held by another, yet this is not always true. [Second Street Improvement Co. v. Kansas City Southern Railway Co., 255 Mo. 519.] In this case we held that where the railroad company went into possession with the knowledge or consent of the owner, then such owner would be driven to ask for its just compensation in an action for the appropriation of his property, rather than have a suit in ejectment to recover such property in kind. The rule announced in the case supra is one well sustained by the case law, and it should be added that such rule is founded upon the idea that the broad rights of an individual should be curtailed to some extent if the exercise of the broad right would interfere with the public service. So the courts say that whilst a landowner usually has the broad right to sue in ejectment and recover in kind lands wrongfully in the possession of another, yet if he has stood by and permitted improvements to be made thereon by a public service corporation, such as a railroad, which improvements are to be used in connection with the public service, such broad right will be refused and the landowner required, in the interest of the public service, to sue for and take the value of his land rather than the land itself. This, however,

is somewhat by the wayside. The real question is, have these improvements become the property of the defendant by being a part of the realty under the facts of this case? We think not. This question is practically settled by the very recent utterance of Court in Banc in Hatton v. Railroad, 253 Mo. 660. In that case FARIS, J., discusses all the case law upon the question of whether or not these improvements shall be considered realty or personalty. In that case we endorse the rule announced in 33 Cyc. 227, which is in this language:

"Where the company's occupation of the land is not illegal, its rails and other structures thereon do not become a part of the realty, and it should have a reasonable time in which to remove them, upon abandonment; and the fact that the landowner has been allowed to take possession of the land embraced in the right of way and hold it for a term of years less than is required to extinguish the company's easement does not imply relinquishment by the company of its right to enter and remove its structures."

To state the rule in different language: If the possession of the railroad is with the express or implied consent of the landowner, then upon leaving the property if the railroad does leave it, the right to remove its improvements is unimpaired. In other words, the trend of the case is that such property is and remains personal property, and does not attach to and become a part of the realty. In the instant case the property was bought by defendant for the very purpose for which it was afterward used. By express language the railroad was authorized to use the property for railroad purposes, a matter in which the general public have a practical concern. The lease itself made no provision as to the disposition of improvements at or after its termination. The lease, however, gave the railroad an option to buy, but no more. The railroad did not have to buy under the lease. If it thought the

price named too high at the end of the lease it could
decline to buy and have a reasonable time in which to
remove its property.   Or on the other hand it could
decline the option, and proceed as it did, to get title
by condemnation.   The time between the expiration
of the lease and the institution of the suit was short,
and at least partially occupied in an attempt to agree
with defendant upon the terms of a settlement and a
conveyance of the property.   Under these circum-
stances the improvements never became a part of the
realty, so that defendant would become entitled to
compensation therefor in this action.  We think the dis-
cussion in the Hatton case, supra, settles this question,
but there are others settling the question on a different
line of reasoning, but a line sound nevertheless.   In
15 Cyc. 763-764, it is said:

"Where a corporation invested with the power of
eminent domain enters upon land without the consent
of the owner, express or implied, and places improve-
ments thereon, and subsequently institutes proceedings
to condemn the same land, the common law rule that a
structure erected by a tortfeasor becomes a part of the
land does not apply and the owner is not entitled to
the value of the improvements thus wrongfully erected.
So where a company enters and erects improvements
pending condemnation proceedings which are subse-
quently abandoned, or where it has no positive knowl-
edge as to the ownership of the land, and enters upon
it with the intention of subsequently instituting con-
demnation proceedings, or of subsequently purchas-
ing the land, the owner is not entitled, in proceedings
for condemnation afterward commenced, to an award
for the value of the improvements so constructed. *With
stronger reason the landowner is not entitled to the
value of such improvements, if the company enters
on his land with his permission; and if the company
enters with the consent of a person in possession claim-
ing under color of title, one who afterward shows him-*

*self to be the paramount owner is not entitled to recover the value of the improvements placed on the land by the company.''*

The italicized portion of the text (the italics are made by us) announces the rule applicable to the facts of this case.

To the doctrine that where the improvements are made without the consent of the landowner, yet such owner is precluded from recovering for the improvements, there is some discord in the cases, but where the improvements for railroad purposes are made upon the land either with the express or implied consent of the landowner, the overwhelming case law is that in subsequent proceedings the landowner cannot claim the benefits of the improvements to enhance his damages for the taking of private property for a public use. [*Vide* cases cited under the text in Cyc., supra.]

In 10 Am. & Eng. Ency. Law (2 Ed.), p. 1159, it is said:

''Where the government or a corporation to which has been delegated the power of eminent domain enters upon land before its condemnation, but with the consent or license of the owner, and proceeds to construct its works or to make improvements upon the land, such works or improvements do not become a part of the land, and their value is not to be considered in determining the compensation to be awarded for the land.

''Where the company enters upon the land and makes improvements without the consent of the owner and without having caused the land to be condemned, there is a difference of opinion as to whether, in subsequent condemnation proceedings, the owner is entitled to compensation for the improvements made by the company. But the greater weight of authority seems to be against the owner's recovery for such improvements.''

Under these texts we again have collected the cases which amply sustain the rules announced.

In 4 Sutherland on Damages (3 Ed.), sec. 1076, it is said:

"The numerous exceptions to the common law rule that everything attached to the realty by one who had no right to the latter became part of it have been extended in recent times upon grounds of public policy so far as railroad companies are concerned. An entry by them in advance of the acquirement of the right to make it is not unlawful in the same sense as such an entry by an individual or a corporation which is not invested with the power of eminent domain. Hence, if such a company enters upon land with the consent of the life tenant or the person who appears to own it and erects a depot or other structure thereon without injuring the inheritance, the remainderman or legal owner cannot, in a subsequently instituted proceeding for the condemnation of the property, recover the value of such improvements. This is the rule where the entry is made without license."

Here we have the idea of public policy noted by us in the beginning of this opinion. The courts have different ways of putting the rule, and the reasons therefor. Thus in McClarren v. Jefferson School Tp., 169 Ind. l. c. 143, the court said:

"The great weight of authority, however, is that when a person, corporation, or body, invested with the power of eminent domain, enters upon land with or without the consent of the owner, express or implied, and places improvements thereon, and subsequently institutes proceedings to condemn the same land, the common law rule that a structure erected by a tort-feasor becomes a part of the land does not apply, and the owner is not entitled to the value of such improvements."

This court collects and cites cases, both Federal

and State, from every section of the Union. In Railroad v. Dunlap, 47 Mich. l. c. ——, the Michigan court says:

"We are of opinion that no error was committed in excluding from the compensation allowed to Dunlap the value of the railroad track laid upon the land. We think the case cannot be distinguished from Morgan's Appeal, 39 Mich. 675. The railroad company, whether rightfully or wrongfully, laid this track while in possession and for purposes entirely distinct from any use of the land as an isolated parcel. It would be absurd to apply to land so used, and to a railway track laid on it, the technical rules which apply in some other cases to structures inseparably attached to the freehold. Whatever rule might apply in case of abandonment, it is clear that this superstructure was never designed to be incorporated with the soil except for purposes attending the possession; and in a proceeding to obtain a legal and permanent right to occupy the land for this very purpose, there would be no sense in compelling them to buy their own property."

To like effect is Jones v. Railroad, 70 Ala. l. c. 232, whereat BRICKELL, C. J., said:

"The duty rested upon the appellee, before the taking and appropriation of the lands, to have caused, in the appointed mode, an ascertainment of the compensation to which the owner was entitled, and to have made payment of the compensation. Neglecting this duty, the entry upon and possession of the lands was wrongful—no title to them was acquired, and the title of the owner was not divested. The neglect of the duty, the wrongful entry and possession, does not preclude the appellee from resorting subsequently to the appropriate proceedings for the acquisition of the lands, and, of consequence, availing itself of all the structures it may have placed thereon. [Justice v. Railroad, 87 Pa. St. 28; Secombe v. Railroad, 23 Wall. 108.] Though the appellee was a trespasser, by rea-

son of the neglect to pursue the proper remedy for acquiring the lands—acquiring them without the consent of the owner—there is in the right continuing in him to pursue the remedy, rendering the possession rightful, and by which title may be acquired a plain distinction between the appellee and a common trespasser. As against such trespasser, the proprietor can keep the lands, and, keeping them, hold the improvements he may have annexed to the soil. No remedy is given the trespasser, by which he may acquire the use and enjoyment of, or title to the lands. There is, also another distinguishing fact; the structures of the appellee were dedicated, not to the use and enjoyment of the freehold, but to public uses which are the consideration for the grant to the appellee of corporate franchises, and of the right, in the exercise of these franchises, to take and appropriate private property. [Justice v. Railroad, supra; Railroad v. Canton Co., 30 Md. 347; Morgan v. Railroad, 39 Mich. 675; Lyon v. Railroad, 42 Wis. 538.] These elements of the case distinguish it from that of the trespasser entering upon lands, fixing chattels to the freehold for its use and enjoyment, which he must intend to convert into realty, and which, following the title to the soil, as one of its incidents, pass to the proprietor."

In the Jones case the railroad had entered the land without legal right, further than the statutory right to condemn. It had no authority from the owner to enter and make the improvements, but did enter and make them. The landowner claimed that he was entitled to the value of the improvements, just as contended here, but the lower court found against him, and he met with no better fate in the Supreme Court. The courts all proceed upon the theory that there being the right to condemn vested in a railroad corporation, it cannot become a trespasser in the same sense as an individual or corporation having no right to condemn,

because the corporation having the right to condemn can perfect its title, and possession by a subsequent condemnation, whilst the party having no right to condemn, can never perfect his right to hold the land. In Newgass v. Railroad, 54 Ark. l. c. 146, it is said:

"It is insisted that the court erred in refusing to include in its estimate of the value of the land taken the value of a railroad previously constructed upon it by the appellee or its vendors. It is argued that the railroad was built on it by a trespasser; that it became a part of the land and, as such, passed to the landowner; that when the petition was filed the railroad was as much the property of the appellant as the soil itself, and could not be taken from him without just compensation. There is an old maxim that 'whatever is affixed to the soil belongs to the soil;' and it is a general rule of the common law that a trespasser who builds on another's land dedicates his structure to the owner. The reason of the rule, which has been often stated, is that the entry was a trespass to the injury of the owner, and that the trespasser could not add further injury by tearing down and removing the building, for in that the law contemplates that an injury to the soil will result as a necessity. The trespasser has no legal right to acquire the soil, and when he places on it a building which cannot be removed without some injury to it, it will be presumed that he intended to dedicate the building to the use of the land, and not that he contemplated a second trespass. He could not remove the building, for its severance would damage the soil; he could not exact pay for it, for he could not impose upon the owner of the soil an obligation to pay for improvements which he had not authorized and may not have desired. Those reasons fail when applied to the case at bar. The corporation had the right to enter upon the land for purposes of survey, and to appropriate it on making just compensation. It is therefore not necessary to presume that when it

built its railroad it intended either to dedicate it to the use of the land or to commit another trespass to the damage of the land; but it is more reasonable to presume that it intended to retain the railroad for use as such, and lawfully to acquire the land upon which it rested. The railroad was not built to improve the ground, or to enhance its ordinary utility, but to be used as part of an easement for public purposes, entirely independent of the ordinary uses of the ground. To the rule relied upon, exceptions have always been recognized, increasing with the importance and value of personal property, and with the demands and exigencies of society; and as its reasons fail in this case we do not think it should control. All that the Constitution guarantees or the law demands is that just compensation shall be made to the owner in return for property appropriated by the public. A rule that would exact of a corporation the payment of a sum to cover the value of a railroad as such, constructed at its own expense, would go beyond the demands of justice, and could find no sort of countenance in conscience or in law outside of the strict letter and fanciful presumptions of the rule stated. The same question has been often adjudicated by the courts of the highest dignity and learning in sister States, and the decided weight of adjudged cases is against the appellant. Aside from adjudication, reason and justice condemn the contention.''

Nor are we wholly without authority in this State. [Dietrich v. Murdock, 42 Mo. 279; Hosher v. Railroad, 60 Mo. 329.]

There can be no question that, where the railroad with the knowledge and consent of the landowner places improvements upon the land, such owner cannot claim for such improvements in a condemnation suit, subsequently brought to acquire such lands. The case at bar is not different in principle.

III. The foregoing disposes of all the improvements except a building called "Stillwell's Rest." This, it is claimed, was erected largely by funds furnished by A. E. Stillwell, the president of the railroads concerned. It was a house maintained along Condemnation: with the other improvements for the con-
Value of Other
Improvements. venience, pleasure, recreation and edification of the employees of the railroad. Its name indicates in a way its use. Whilst the funds were largely donated by Stillwell, yet when the building was put up it was used in connection with the railroad properties, and should be so considered in this case. It was built to be so used, and the fact that the president of the railroad donated largely to this wise provision for the employees of the railroad does not change the character of the property. In the assessment of damages it should be classed as one of the railroad improvements, because it was so maintained and used. This contention of the defendant is therefore overruled.

IV. It is next urged that the court erred in fixing July 8, 1903, as the date at which the value of the property taken should be determined. July 8, 1903, was the date when the commissioners made and returned into the court their assessment of damages. Defendants by one instruction asked (instruction No. 3½ given by the court) fixed July 8, 1903,
Condemnation: as the date at which the value should
Date of
Valuation. be determined, and in this it accorded with plaintiff's instruction. But by another instruction (No. 4, which was refused) it asked that October 6, 1902, be taken as the date upon which to determine the value. This date is the date of the filing of the suit in condemnation. Defendant having asked and obtained an instruction fixing July 8, 1903, as the proper date for determining the value of the property is in no position now to question the instruc-

tion for plaintiff fixing the same date. This proposition has been so universally ruled, and always in the one way, citation of cases would be superfluous. If the court erred the defendant was a party to such error.

But we need not stop here. Land is not taken for public use until it has been condemned and paid for by the party desiring it and authorized by law to take it. As a general rule the appropriation and taking is fixed as of the date the commissioners make their report of the damages, and the condemning party pays such sum into court for the benefit of the landowner. Up to this point the party can abandon the condemnation, but when the payment is made there is and has been a taking of the property in a constitutional sense. Such seems to be the well-settled rule in this State. [Railroad v. Townsite Co., 103 Mo. 451; Simpson v. Kansas City, 111 Mo. 237; Railroad v. Railroad, 138 Mo. 591; State ex rel. v. Fort, 180 Mo. l. c. 110.]

There is nothing in this case to take it out of this general rule. Under the evidence the relation of landlord and tenant existed until the taking in the constitutional sense was undertaken in this condemnation proceedings. Defendant recognized this relation of landlord and tenant by bringing suit for the rents. Under the facts of this case, the instruction given for the plaintiff was right, and that refused the defendant was wrong. The point is ruled against the defendant.

V. Complaint is urged as to plaintiff's instruction numbered one, which reads:

"The court instructs the jury that under the law of the State of Missouri and of the United States the plaintiff railroad company was obliged after the condemnation of the land to furnish to defendant's ele-

vator all reasonably necessary switching services and
facilities, such as supplying cars, storing
Switching cars, moving cars to and from said ele-
Facilities:
Measure of vator, and switching and transporting the
Damages. same to and from the elevator without
discrimination or favor, and at reasonable
rates, neither higher nor lower than it performed the
same service for other elevators similarly situated
along the line of plaintiff's railway, and the jury must
not allow defendant any damages in the belief that
by reason of these condemnation proceedings where-
by defendant's land was taken on both ends of the
elevator, said elevator was or in the future would be
deprived of such switching services and facilities.''

To get at the right of this proposition we must
consider this instruction along with other instructions
given. At the request of defendant the court gave de-
fendant's instruction numbered two, which reads:

''The court instructs the jury that the defendants,
the Second Street Improvement Company, in this case,
is entitled to damages against the plaintiff for a sum
equal to the difference of what the fair market value
of the whole property was at the time of the appropria-
tion with such improvements thereon as was owned
thereon by the Second Street Improvement Company
and the fair market value of the property left and
not taken by the plaintiff and of which that taken forms
a part, and in arriving at said damages you may first
ascertain and allow as damages the fair market value
of the land taken, *and in addition thereto you should
allow the defendant the additional damages, if any,
to the land and improvements of the defendant, which
were not taken by the railroad and which formed a
part of the land taken;* and in determining what is
the market value, your inquiry should be directed to
what is. the property worth in the market in view not
merely with reference to the use it was put at the time
of condemnation, but with reference to the uses for

which it was plainly adapted, having regard to the existing business or wants of the community at the time of the condemnation or such as may have been reasonably expected in the immediate future."

We should further go to some of the evidence bearing upon the question to the end that the theory *nisi* may be fully gathered. The railroad was not condemning the land upon which the elevator stood, but was condemning the land right up to the elevator. Under the lease the railroad company was to put switch tracks to elevators, and this it had done. The railroad in this proceeding was condemning the land upon which these switch tracks were built, to the end that it might own all of its tracks and other improvements, but not the elevators along its line. Now with these things in view let us turn to the evidence introduced. The defendant introduced a Mr. Minter and he testified:

"Q. I will ask you whether or not the Second Street Improvement Company being deprived of the right to construct and maintain its own switch tracks upon this land colored red, and taken in this proceeding, to and from its elevators, as distinguished from the switching facilities which the railroad is required by law to furnish, would affect the value of that Sun Elevator on that date, July 8, 1903? A. Well, I would say anything from sixty-five to seventy-five per cent of the valuation of the elevator."

On cross-examination he further said:

"Q. Now, Colonel, if in this situation precisely the same switching facilities are furnished and the same room for the storage of cars, and everything of that kind, that existed before the condemnation, where does the damage lie? A. The damage lies in the possession of the ground to the elevator.

"Q. The possession of what ground? A. Why, the ground that they own; when you take away the

ground from the elevator I say you practically destroy the greater value of the elevator.

"Q. Well, why? A. Simply because when you go to sell the elevator you sell it without the ground.

"Q. Well, all you want the ground for, as I understand, is for switching purposes? A. Yes, but when you come to sell it you want to own the ground as well as the switching service too."

There was other evidence along the same line. Now, under this evidence and defendant's instruction numbered 2, supra, it is clear that the jury was directed to allow the defendant any damages which might result to the elevator property itself by reason of the taking from the owner of the elevator this adjoining land upon which the tracks were located. We have italicized that portion of defendant's instruction number 2 which applies to the facts shown as above. That italicized portion reads: *"And in addition thereto you should allow the defendant the additional damages, if any, to the land and improvements of the defendant, which were not taken by the railroad and which formed a part of the land taken."* Under this evidence and this instruction the defendant was allowed to recover (and from the verdict, we think did recover) for such damages as were occasioned to the elevator property by the taking of the land adjoining it. Both the evidence and the instruction authorized such a recovery. Instruction number one for the plaintiff does not undertake to preclude the defendant from the recovery of these damages to its remaining property by reason of the taking of the adjoining property. All such instruction does is to tell the jury that under the law the railroad company was required to do certain things, and these things should not be considered in determining the depreciation of defendant's remaining property by reason of the taking of the adjoining land. We think the instruction a proper one. It does not preclude the defendant from recovering

damages to the property remaining by reason of the taking of the land adjoining the elevator. Nor does it preclude the defendant from recovering damages to its remaining property, the elevator, by reason of having its individual switch grounds taken, because such damages were recoverable under defendant's instruction number 2, supra. Not only so, but defendant put in its evidence on this theory, as appears from the portions which we have quoted, supra. Under instruction number 2, supra, and the evidence, supra, the defendant could recover for all damages done to its remaining property, by reason of taking the land adjoining, including such damages as might result to the remaining property (the elevator and ground upon which it stood) by reason of having its private switch ground taken away. The instruction for plaintiff, vigorously assailed by defendant, only directs the jury not to find for defendant any damages to its remaining property on the theory that it would not be furnished reasonable switching facilities after the condemnation. If the defendant failed to furnish reasonable switching facilities, the defendant has its action for such failure. There was no error in giving plaintiff's instruction number one.

VI. It is next insisted that there was error in the admission of the testimony of the witness Truitt. This witness was one of the commissioners. He seemed to have had no independent recollection of the value fixed by the commissioners. Counsel for the plaintiff was trying to refresh the witness's recollection by having him refer to the report. Counsel for defendant were continuously objecting to having the witness thus refresh his recollection, but at no time did counsel for defendant say the report itself was not competent evidence for some purposes, although said counsel did say that it

Condemnation: Commissioners' Report: Refreshing Witness's Memory.

was not competent for refreshing the witness's recollection or to show the value of the land. The court had several times said that the report was not competent, and that an indirect effort of getting the facts of the report before the jury was improper. This matter covers several pages, but the exact situation had best be set out. The counsel for the plaintiff was contending that the report of the commissioners was competent, and counsel for defendant was not combating that view, except to the extent that it was not competent to be used for the purpose of refreshing the witness's recollection, or as evidence of value. The situation is best shown by the record, thus:

"Q. The commissioners' report, Mr. Truitt, was filed July 8, 1903, and the land which is sought to be condemned in this case, is all of this land shown in pink or red coloring on this plat which is in evidence as Exhibit I. I wish you to state to the jury what, in your opinion, was the fair reasonable market value of that land on the date of the filing of this report July 8, 1903? A. I don't remember what the value was placed upon it; the report there, I suppose, shows.

"Q. The amount named in the report? A. That would be my answer. I have no recollection of what the amount was.

"Q. I will refresh your recollection by letting you look at this report which you made at that time.

"Mr. Wright: If Your Honor please, I object to that. The report of Mr. Truitt, refreshing his recollection from the report is not a proper way of getting at the value. If he is an expert on this, he knows what the value was at that time.

"The Court: Yes, the commissioners' report is not competent.

"Mr. Crane: I don't want to introduce the report, but he says that he—

"The Court: That is just an indirect way of getting in what he did before, showing him what he did and then asking him to do it over.

"Q. Well, Mr. Truitt, there were something like twenty and three-quarters acres taken in this proceeding, and what I want to get at is what, in your judgment, on that date was the fair reasonable market value of that per acre? A. It is the amount set forth in that report, is what we felt that the land was worth at that time.

"Mr. Wright: I object to that, if Your Honor please, and move to have it stricken out as being not responsive to the question, not a proper answer to the question.

"The court sustained the motion to strike out.

"Q. You went out and looked at the property at that time? A. Yes, sir.

"Q. In company with the other commissioners? A. The other commissioners, yes, sir.

"Q. And did you investigate as to the value? A. Heard the evidence as to value from both sides, yes, sir.

"Q. And you say you looked at the property? A. Yes, sir.

"Q. And adjoining property around there? A. Took into consideration everything around there and there were values proven on property on practically all sides of it.

"Mr. Wright: I object to that, if Your Honor please, as assuming the legal conclusion that the values were proven as to surrounding property, invading the province of the jury in this case, and ask to have that answer stricken out.

"The court sustained the objection and motion to strike out.

"Q. I don't care for that. I am simply asking if a thorough—. A. A thorough examination was made of the property.

"Q.   A thorough examination was made of the property.  Do you remember, Mr. Truitt, what allowance was made per acre?   A.   I do not.

"Q.   You don't remember?   A.   I dismissed it from my mind after that and never thought of it since until I was asked to come down and testify two or three days ago, and I have not seen the report or given it a thought since that; I didn't think I would have to come down, didn't want to come; I was too busy to get away.

"Q.   Well, now, then, if it be a fact and if it be shown in evidence that you at that time—

"Mr. Wright:   I object, if Your Honor please, if he intends to give any figures at this time he is indirectly getting the report before the jury of the commissioners by assuming a state of facts.

"Mr. Crane:   *You don't pretend that I don't have a right to offer this report in evidence?*

"Mr. Wright:   *You don't have a right to offer it for the purpose of refreshing his recollection now, or showing the value of the land.*

"Mr. Crane:   *I understand that, but you don't contend that I don't have a right to offer this report in evidence.*

"Mr. Wright:   *I expect all the facts in this case are competent evidence.*

"Q.   (By Mr. Crane):   You say you don't recollect that amount at the present time?   A.   No, I don't recollect it, I don't.

"Q.   I will ask you, Mr. Truitt, if it shall appear in evidence here that the amount allowed by the commissioners was twenty-six thousand dollars, whether or not that, in your judgment, was the fair reasonable market value of the land at that time?

"Mr. Wright:   I object to that, if Your Honor please, as being incompetent, irrelevant, and immaterial and not a proper method of refreshing the rec-

ollection of the witness, and as indirectly assuming facts, invading the province of the jury.

"Mr. Crane: I think the witness has shown that he was at that time familiar with the market value; he made an endeavor to ascertain what it was, and since that the matter has passed from his mind and he don't now recollect it as an independent proposition.

"Mr. Wright: I don't think he has.

"Mr. Crane: Don't have to; he recollects that whatever the allowance was at that time was the then market value of the land.

"Mr. Wright: I object to it.

"The Court: It is admitted that the commissioners' report is competent evidence in the case, that objection will be overruled.

"To which ruling of the court, defendant then and there at the time duly excepted.

"Q. (By Mr. Crane): What is your answer? A. My answer is whatever the amount set forth in that report is, that was what we felt was a fair valuation for the land at the time of this proceeding, and if that be twenty-six thousand dollars, that is the amount."

"Redirect Examination by Mr. Crane.

"Q. I will let you look at this report, Mr. Truitt (handing commissioners' report to witness who examines it): Now Mr. Truitt, have you finished with your examination? A. Not quite—well, I want to look the first over again, I was trying to see the amount of ground taken here.

"Mr. Braley: It is on the blueprint, I guess.

"Witness: I suppose it is on the blueprint or set forth here at the last, I suppose.

"Mr. Crane: No, I believe it is twenty—how many acres?

"Mr. Braley: Twenty and three-quarters acres.

"Mr. Crane: This center strip is not taken, you know, it runs from here down to here, down to here (indicating on the map).

"A. Yes, twenty and three-quarter acres.

"Q. (By Mr. Crane): Having seen your report and examined it, can you now state what the fair market value of that land, that twenty acres, in July, 1903, was?

"Q. (By Mr. Braley): Wait a moment. Independent of your report which you made at that time do you now know what the market value was of that twenty and three-quarter acres taken in this condemnation proceeding on July 8, 1903? A. My knowledge is based upon the report that I handed in at that time.

"Q. And independent of that you don't now know what the market value is? A. I should say it was worth from a thousand to fifteen hundred dollars an acre, just guessing now, because I gave myself such wide latitude; I think I hit about where it was, but to get at what the actual value was at that time, I couldn't say except that we have given our sworn statement in that report there that that was what we felt it was actually worth at that time—no, I could not give the exact value of that land.

"Mr. Braley: Well, I object to his answer in which he states he is giving a guess it would be worth a thousand and fifteen hundred dollars an acre.

"A. I know it was not worth over fifteen hundred dollars at that time, and I am not positive it was not less than a thousand, so that is the reason I placed my figure so.

"Mr. Braley: He says it is a guess as to what it was, independent of the report.

"Mr. Crane: Well, he put the guess in the sense— from a thousand to fifteen hundred dollars I understood is not a guess, but he says he has given me a

wide berth.  A.  A wide latitude so I would be sure I would not miss the value of the land.

"Q.  (By Mr. Crane): You say independent of the commissioners' report your statement now, the testimony is independent of that, it would be from a thousand to fifteen hundred dollars?  A.  That would be my recollection of the value at that time.

"Q.  And you actually thought it was at that time without paying any attention to it since?  A.  That would be my recollection of the value at that time.

"Q.  And you actually thought it was at that time without paying any attention to it since?  A.  It was twelve hundred and fifty-three dollars per acre.

"Q.  Twelve hundred and fifty-three dollars per acre?  A.  From the report, yes, sir.

"Mr. Braley:  We ask that that answer as to twelve hundred and fifty-three dollars an acre be stricken out as simply a computation of what his report is, and he says he don't know whether that was the actual value except by referring to his report.

"The court sustained the objection and motion to strike out.

"Mr. Crane:  Now, I offer to show by the witness that in 1903, July 8th, he ascertained the market value of this ground; that he stated it in the report, that he then dismissed the matter from his recollection and has had nothing to do with it since that time, and he don't recollect, independently of the report, exactly what he found it to be at that time, but that he does recollect that it stated in the report, and that he will now testify, that what was there stated in the report was at that time the acual value, actual market value of the land.

"The Court:  Well, it is admitted that the report is competent evidence.  Now, the report itself shows what the commissioners found.

"Mr. Crane:  Yes, Your Honor.

"The Court: That is the best evidence of that, the commissioners will not be permitted to dispute it, so it is not necessary for him to testify to it.

"Mr. Crane: I don't want him to dispute it, and on the other hand, I don't want his testimony thrown entirely from the record, but I do want to show that he can from the report refresh his recollection on a matter which he has since dismissed from his mind, and testified then exactly what the market value was as he ascertained it to be at that time.

"The Court: But suppose that he is testifying from the report.

"Mr. Crane: Well, he is refreshing his recollection from the report.

"The Court: And the report is the best evidence of what he ascertained at that time.

"Mr. Crane: Then you overrule my offer.

"The Court: Yes, sir, it is not necessary for him to fortify his own report.

"Q. (By Mr. Crane): Whatever you found in that report, reported to the court, was in your judgment, the market value at that time? A. Yes, sir; it is, was sworn to.

"Mr. Braley: I object to that and move that the answer be stricken out as incompetent, irrelevant and immaterial and invading the province of the jury.

"Witness: Your Honor, after I look that report over can't I state what the market value was of that land at that time?

"The Court: If you know of your own knowledge after refreshing your recollection.

"Witness: I do know of my own knowledge after looking it over.

"Q. (By the Court): If you know of your own knowledge what was the fair market value of that property in July, 1903, you can testify. A. I do, from the evidence before the commissioners, what it was worth.

"Q. (By the Court): No, but of your own knowledge, do you know of your own knowledge?

"Q. (By Mr. Crane): It does not mean what source you got it from, but if you know of your own knowledge, from whatever source you got it. A. I know of my own knowledge what I felt at that time it was worth.

"Q. What was that? A. Twelve hundred and fifty-three dollars an acre.

"The Court: Proceed.

"Mr. Wright: We object to that and ask that the answer be stricken out as not being competent or relevant of what it was worth; he does not testify that it was what the witness at that time felt was market value, or that he had any personal knowledge other than what is contained in the report and we move that the answer be stricken out as to what he felt at that time.

"The court overruled the objection and motion to strike out; to which ruling of the court defendant then and there at the time duly excepted.

"Q. (By Mr. Crane): You signed the report and swore to it? A. I signed the report and swore to it, yes, sir.

"Mr. Braley: Was that stricken out?

"The Court: No.

"Mr. Braley: He said what he felt it was worth at that time; we would like to have a ruling on the question.

"The Court: I understood the witness to say that he knew what was its value at that time after having refreshed his memory.

"(Answer read by the witness.)

"Mr. Wright: I move to strike it out. It was simply a statement of the witness's feelings at that time, based solely on the report, and incompetent, irrelevant and immaterial.

"Q. (By the Court) : You mean that as a conclusion from what you heard from other witnesses? A. A conclusion from what I heard at that time, backed up by the report that we made.

"The Court: Well, the motion will be sustained.

"Q. (By Mr. Crane) : You mean, as I gather it, Mr. Truitt, that you went out there and examined the land? A. Heard the evidence.

"Q. Heard the evidence? A. And at that time it was worth twelve hundred and fifty-three dollars an acre.

"Q. And made investigations? A. Made investigations.

"Q. As to other sales in the neighborhood? A. Other sales and all the evidence that was before us.

"Q. And from that you arrived at it? A. I say at that time it was worth twelve hundred and fifty-three dollars an acre.

"Q. And you know that of your own knowledge? A. Know that of my own knowledge after refreshing my memory.

"Q. And I suppose, too, in arriving at that you took into consideration the—

"Mr. Braley: Wait a moment. I object to the form of the question.

"Q. (By Mr. Crane) : I don't want to put it in leading form. Did you or not also in arriving at that value take into consideration such knowledge as you had gained in the real estate business here in the city? A. I did.

"Mr. Crane: That is all."

The trial court was right in saying that the report of the commisioners was improper, and of course counsel for the plaintiff was in error in contending that it was competent. This Division had the question up in Railroad v. Roberts, 187 Mo. 1. c. 321, and by a full consent, we then said:

"When the exceptions are sustained, the report of the commissioners is set aside and becomes *functus officio* except for the purposes hereinafter indicated. The jury have no more right to know what the report or assessment of damages of the commissioners was, than any jury in any case has to know what the verdict of a previous jury was in the same case. The jury in such cases has only one duty to perform, and that is to assess the damages the defendant will sustain by the appropriation of his land to public use. All other questions arising in any manner in the case, are matters for the court to settle in its judgment. The rule laid down in the Clark case (119 Mo. 357) and reiterated here, is in accord with the law in other jurisdictions. 2 Lewis on Eminent Domain (2 Ed.), sec. 449, states the law as follows: 'On appeal from the commisioners and trial *de novo*, the report appealed from is not evidence as to the amount of damages.' The authority cites cases supporting the text from Indiana, Iowa, Wisconsin, Kansas, Rhode Island, and Massachusetts. The case of Railroad v. McElroy, 161 Mo. 584, does not correctly state the law and it is therefore overruled."

In Railroad v. Pfau, 212 Mo. 398, our brothers in Division Two, quoted and approved the above language from the Roberts case, and we have no doubt about the correctness of that rule. It is clear from the evidence quoted above that the plaintiff evidently got before the trial jury the contents of the commissioners' report of the amount of damages. It is true that the report itself was not offered in evidence, but its poisonous effect was instilled into the jury by this evidence of Truitt. No person can read this evidence without knowing that thereby the jury was given to understand that the commissioners had found this property to be of $26,000 in value. It was but an indirect method of putting the report of the commissioners in evidence, which was not allowable under the rulings above men-

tioned.  Counsel for the plaintiff, in this court, do not controvert the doctrine of the Roberts and Pfau cases, supra, but they say that the counsel for defendant are in no position to urge the question here.  In their brief here counsel for plaintiff put the matter thus:

"The report of the commissioners was not offered in evidence, although, under the attitude of defendant's counsel, the plaintiff would have been justified in offering it *in toto*.  A litigant is never permitted to play fast and loose with the court.  It must take a stand one way or the other.  Defendant's counsel were asked squarely to say whether or not they objected to the introduction of the report in evidence and they squarely stated that it was competent evidence and the court so understood them as did counsel for plaintiff.  When Mr. Truitt was on the stand, this occurred.

"'Mr. Crane:  I understand that, but you don't contend that I don't have a right to offer this report [commissioners'] in evidence.

"'Mr. Wright:  I expect all the facts in this case are competent evidence.'

"Instead of saying he did object to this being offered in evidence or used in evidence, counsel for defendant made the foregoing answer.  Both the court and counsel for plaintiff understood this to mean that it was conceded by defendant's attorney that the report could be used.  Witness this language of the court on the following page:

"'The Court:  It is admitted that the commissioners' report is competent evidence in this case, that objection will be overruled.'

"And defendant's attorneys made no objection or protest to this statement showing the understanding of the court.

"Again, this occurred:

"'The Court:  Well, it is admitted that the report is competent evidence.  Now, the report itself, shows what the commissioners found.

" 'Mr. Crane: Yes, Your Honor.'

"And again defendant's counsel were mute and made no objection to the statement and understanding of the court as to the admissibility of the report.

"It is too fundamental to need citation of authority that counsel cannot at the trial take an attitude of this kind and then attempt to put the trial court in error here after such plain concessions. It may be that the counsel had purposes of their own in thus conceding the admissibility of the report at the time of the trial. Whatever those reasons may have been, it is too late now to contend that any error was committed in this regard."

We are not inclined to the view that the action of counsel for the defendant amounts to an admission that the report of the commissioners was competent. Nor do we think the trial court was justified in so construing it, although there is some ground for such a construction. It is clear that counsel for defendant was objecting to the use which was being made of this report, i. e., to refresh the recollection of an *expert* witness. It is clear that the report was so used. It is further clear that in doing so the substance of that report was before the jury. The report was not properly used to refresh the expert witness. An expert testifies to things within his own knowledge, or gives his expert opinion upon a hypothecated state of facts. There is no reason for refreshing the recollection of such a witness. Upon the whole the examination of this witness was improper, and constituted prejudicial error. We cannot say that this character of evidence did not influence the jury, when it is considered that the evidence for the defendant tends to show damages far in excess of that allowed by the jury. For this error the judgment as to damages should be reversed and the cause remanded for the trial of that issue only. There are other matters argued, but they are not such as we deem it necessary to discuss them.

Let the judgment be reversed and the cause remanded for the reason aforesaid, and with the directions aforesaid as to the issue to be retried. All concur.