CENTRAL HANOVER BANK & TRUST COMPANY, Hamlin F. Andrus, as Trustee, Wm. H. Taylor, as Successor Trustee, v. PAN AMERICAN AIRWAYS, INC.

188 So. 820.
Opinion Filed May 2, 1939.
Rehearing Denied May 31, 1939.

*Shutts & Bowen, Crate D. Bowen, L'Engle & Shands* and *E. McCarthy, Jr.,* for Plaintiffs in Error;

*J. E. Yonge, S. P. Robineau* and *H. J. Friendly,* for Defendant in Error.

THOMAS, J.—In March, 1927, the defendant in error, Pan American Airways, Incorporated, filed in the office of the Secretary of State of the State of New York its certificate of incorporation pursuant to the provisions of the Stock Corporation Law.

Among the purposes given for the formation of the Corporation were the conduct of a general aviation business; the development of air transportation, the instruction of pilots; the promotion of test flights, aerial photography, mapping and dusting "and all other pursuits in which aircraft can be lawfully used"; the dealing in airplanes and accessories; and the purchase, lease or other acquisition of property of all kinds. August 20, 1928, the defendant in error qualified to do business in the State of Florida by

presenting to the Secretary of State an authenticated copy of its charter and paying the required fees.

From September 15, 1927, until October 29, 1928, defendant in error maintained its business of transporting passengers, mail and cargo between Key West and Havana and then transferred its Florida terminus to Thirty-sixth Street in the City of Miami. During this period land airports were used.

In 1930 the Florida terminus was again moved, this time to its present location on Dinner Key, the site of which is involved in this litigation. Meanwhile the activities of the defendant in error had greatly expanded from a few ships flying between Key West and Havana to a fleet of large seaplanes operating between Miami, the sole terminus in the United States, and points in the British West Indies, Central and South America.

The apparent reason for a change in the type of planes used by defendant in error was the superiority of seaplanes over land planes in negotiating vast distances over water between the various termini and the employment of such equipment made it imperative to substitute a landing place on water for the airport at Thirty-sixth Street. To that end defendant in error sent its chief airport engineer to make a survey of available locations suitable to future needs.

According to the statement in the brief filed by counsel for defendant in error, the engineer reported "several available sites," but that the one on Dinner Key was most practical. Therefore, efforts to purchase having failed, a lease was executed in January, 1931, by the parties to this suit.

Briefly, the lease was for a period of five years at $1.00 per annum and the payment of taxes by lessee. It was stipulated that it could be renewed by successive exten-

sions, at the rentals to be computed as provided therein, until September 30, 1980, or fifty years after its original execution.

The lessee has since its occupancy improved the property to meet the requirements of a growing transportation business. It is said that tremendous increase of traffic made additional facilities, including a terminal building, imperative, and that:

"There were obvious objections to the construction of an improvement of this character on real estate on which the company had only a leasehold tenure. Accordingly, on August 16, 1933, by resolution of the Executive Committee of its Board of Directors, * * * it determined to acquire title to the Dinner Key property through eminent domain, *thereby adjudging and declaring the acquisition of such property to be necessary.*" (Italics supplied.)

When the above lease became effective a part of the tract was subleased to the City of Miami and County of Dade. Later the county and city subleased a portion of the tract held by them to the United States for the use of the Coast Guard. The sublessees are not made parties to this suit.

The petition to condemn the fee simple title of the entire tract, including the land which the City of Miami and County of Dade held by virtue of the sublease, was filed January 3, 1935, and therein it was alleged:

"4 That the purpose of the taking of said property is to hold, occupy and develop the same as an air terminal and seaplane base for use in the operations of your petitioner as a common carrier in its international air commerce in the transportation for hire between fixed terminii and on fixed schedules, of mail, passengers and express between Miami, Florida, the West Indies, Central America and South America, and that all of said above described property is necessary to your petitioner for that purpose.

"5. That the right, title or estate sought by your Petitioner to be acquired in said property is the fee simple title therein."

After the pleadings had been settled an inquiry was conducted by the Circuit Judge, without the aid of a jury, to determine the right of petitioner to condemn. Upon careful analysis of the evidence the able Circuit Judge found that the process of eminent domain was available in Florida to the petitioner, a corporation of New York, and that expropriation was necessary for a public use. He adjudged the petitioner entitled to the appropriation upon paying full compensation to be fixed by a jury of twelve men.

At this point we reach the consideration of what appear to be two vital questions, that is, the right of this particular corporation, organized as it is, to condemn, and its authority to take by eminent domain the specific property involved in this controversy.

Plaintiffs in error challenge the constitutionality of Chapter 15,928 of the Laws of Florida, Acts of 1933, because the subject is not disclosed by the title and would not put a reader upon notice of its true contents. Section 5102, C. G. L. 1927, which was attempted to be amended by the above Section 15, 928, reads:

"The right obtained (in condemnation) by the petitioner under the provisions of this Article shall be a right only to use the property taken for the purposes specified, and shall be held to create an easement, and not a fee simple in the property taken."

The title to the amendatory Act follows:

"AN ACT to Amend Section 3294, Revised General Statutes of Florida, 1920, Relating to the Rights Obtained by the Petitioner in Condemnation Proceedings, the Same Being Section 5102, Compiled General Laws of Florida, 1927."

The section referred to in the title is amended to read: " '3294. (2026) Rights of Petitioner.—The petitioner shall state in the prayer of the petition what right, title or estate is sought in the property to be condemned, whether an easement, an estate for years, or the fee simple title, and the verdict and judgment of condemnation shall vest in the petitioner the right, title or estate prayed for in the petition, except that in condemnation of rights-of-way only an easement shall be prayed for or condemned.' "

We believe that the criticism of the title to the Act is not well founded and not supported by the decision in State *ex rel.* Bonsteel, v. Allen, 83 Fla. 214, 91 South. Rep. 104, 26 A. L. R. 735, where it was said:

"The contention that the Act violates Section 16, Article 3 of the Constitution we decided adversely to the petitioner. Where the title of an Act amendatory of the Revised General Statutes gives the numbers of the sections of the law designed to be amended, and also briefly expresses the general subject embraced in such sections, if they have a common connection with the general subject, it is sufficient notice to the Legislature and to the public reasonably to lead to an inquiry into the body of the bill to ascertain what changes are proposed in the existing law, and anything germane to the general subject expressed in the title may be included in the Act. Stokes v. Galloway, 61 Fla. 437, 54 South. 799." 91 South. Rep. text 105.

It will be recalled that the caption complained of refers to the number the statute bears in the Compiled General Laws of 1927 as well as the Revised General Statutes of 1920, and that, too, it directs attention to the fact that the section pertains to rights obtained in condemnation. This seems to be sufficiently definite to lead the public and the

Legislature to inquiry as to what, by judgment in eminent domain, a petitioner might procure.

It cannot be successfully maintained that the title shrouded the real subject dealt with in the Act, nor that it would deceive a reader of it.

We approach the matter of the authority of defendant in error, a corporation organized under the general Stock Corporation Law of New York, to acquire any property in Florida by eminent domain. The Circuit Judge found that they could not have exercised such power in the State or origin, but that such right was given them here.

In 1933, after the defendant in error had entered upon the property under the lease and after the execution of the subleases, the legislators, by statute, Chapter 15,862, delegated to "*All* * * * corporations engaged in air commerce in the transportation of mail, freight, express and/or passengers by aircraft between fixed termini and on fixed schedules" (Italics supplied) the right to condemn and secure the fee simple title to property for airports, air terminals, seaplane bases and landing fields.

The position of plaintiffs in error is that this statute should receive a strict construction, and that when applied it cannot be relied upon by a foreign corporation to invest it with power to take property by eminent domain.

By our laws a corporation organized in another state may qualify to do business here and defendant in error has received authority from the Secretary of State to function in Florida. The Legislature by its Act above quoted has declared that *all* corporations engaged in air commerce may exercise the right of eminent domain to secure landing fields and seaplane bases. It seems sensible to construe the Act as applying to foreign and domestic corporations alike without distinguishing between the one organized

here and one organized elsewhere but licensed to operate here.

The Supreme Court of Alabama decided in The Columbus Water Works Co. v. Long, 121 Ala. 245, 25 South. Rep. 702, that an Act granting *any* corporation the power did not discriminate against a foreign corporation, there being no inhibition in the Constitution against it.

·The Supreme Court of Mississippi held that a foreign corporation had the right to condemn rights of way, where given the power to construct telephone lines despite a provision that telephone companies " 'chartered under the laws of this state' " may condemn. Cumberland Telephone & Telegraph Co. v. Yazoo & Miss. Valley Ry. Co., 90 Miss. 686, 44 South. Rep. 166.

See Texas Midland R. Co. v. Southwestern Tel. & Telg. Co., Tex. Civ. App., 57 S. W. Rep. 312, where reference was given to the foreign corporation having secured a permit to do business in the State where it sued to condemn; also Southern Illinois & M. Bridge Co. v. Stone, 174 Mo. 1, 73 S. W. Rep. 453 and Northwestern Electric Co. v. Zimmerman, 67 Oregon 150, 135 Pac. Rep. 330.

Under the above quoted statutes of this State and bearing in mind both the fact that defendant in error has been permitted to do business in Florida and the nature of its activities, we incline to the view that ample authority is given it to employ our laws in securing private property for use as a seaplane base to accommodate the public in speedy transportation of passengers and express and the United States mail, which it has contracted with the government to carry.

It is argued that it has but one terminus fixed in this State, while others are in various foreign lands; that it may suspend its operations at will; that it is subject to no state supervision or regulation; that its planes travel the

trackless sky and may taxi for long distances, making available a vast territory for landing purposes. These have small influence because they stress too much the letter, too little the spirit, of the acts which are calculated to encourage a means of transportation which will conserve time.

If by the appropriation of private property stage lines, railroads, ferries and the like were made possible, their routes more direct and their facilities more effective, it seems to us that such method should not be denied a great transportation industry, although now in comparative infancy.

The record discloses that the defendant in error has continuously engaged in transportation by air for more than a decade during which it has made ninety-nine per cent of its regularly scheduled flights although its activities are, from their very nature, affected by fog and storm. The progressive increase of passengers, mail and cargo carried since the inception of the airways attests its success as a modern system of transportation.

If we examine Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 South. Rep. 402, we find that to be public a use must be "within the control of the State," and one which cannot be gainsaid, denied or withdrawn; however, it is further announced therein that a use is not private simply because subject to no governmental control or regulation.

The Legislature has exercised the prerogative of declaring that corporations engaged in air commerce may exercise the right of eminent domain to procure landing sites.

We reach the conclusion, after a study of the record, that the business of defendant in error is of that character that its use of the land sought to be appropriated is public.

See Spafford v. Brevard County, *92 Fla. 617, 110 South. Rep. 451.*

Our opinion is, also, that the corporation, having been given the right by the State of New York to acquire property, could, after qualifying to do business in Florida, enjoy the same privilege, with reference to eminent domain, as corporations organized under the laws of Florida.

We arrive now at the matter of the right of Pan American Airways, Incorporated, to obtain by condemnation the fee simple title to property, part of which it already occupies by leasehold and part of which it has sublet to the City, the County and the United States.

It has been held by this Court that the grantee of the power of eminent domain is vested with large discretion in determining what property and how much of it is necessary for its purposes, and that unless it acts in bad faith the courts will not interfere. Wilton v. St. Johns County, 98 Fla. 26, 123 South. Rep. 527, 65 A. L. R. 488; Spafford v. Brevard County, *supra.*

The necessity spoken of need not, according to the authorities we have examined and which we believe to be in the majority, be absolute, but only one that is reasonable, and "such as would combine the greatest benefit to the public with the least inconvenience and expense to the condemning party." 20 C. J., page 631.

The fact that the defendant in error may be occupying the property under a lease, renewable from term to term until the year 1980, and is, therefore, secure in the use of it by virtue of that instrument, would not, in our opinion, defeat the condemnation of the fee simple title to the property.

In the State of New York a railway company was allowed by condemnation to secure the fee, although at the time it had the right to use the property under a lease,

on the theory that no estoppel was created by the latter; that the necessity was permanent, and that the public could not reasonably require the expensive and permanent buildings to be constructed on the land in which the petitioner had only a limited interest. Matter of New York & Harlem Railroad Co. v. Kip, 46 N. Y. 546, 7 Am. Rep. 385.

This case has been discussed in the briefs of counsel for both plaintiffs in error and defendant in error. What is said in the opinion is relevant to the facts in this case. Because of the very nature of the business conducted by The Pan American Airways, Incorporated, the improvements require expenditures of large sums of money. Hangars for the protection of airships, such as are in contemplation, must be of large proportions and so built that the planes may be hauled into them intact. See also Kip v. New York and Harlem Ry. Co., 67 N. Y. 227; and *In re* Ely Ave., in City of New York, 217 N. C. 45, 111 N. E. Rev. 266, where it was decided that it was not within the province of the court to pass upon the question of whether an easement would be sufficient where the city sought to take the land in fee for street purposes.

Our examination of the authorities has led us to the case of Houston North Shore R. Co. v. Tyrrell, 128 Ter. 248, 98 S .W. (2d) 786, 108 A. L. R. 1508, where the Supreme Court of Texas held that an easement, subject to conditions subsequent relative to the operations of trains, would not bar an action to condemn, the result of which would be the release of the railroad from such conditions.

In the case where the county had agreed to build a bridge at a designated place and following certain specifications and subsequently decided to condemn the site and erect a different kind of bridge, the Supreme Court of Alabama held that the actions of the county were proper.

Brown v. Jefferson County, 211 Ala. 517, 101 South. Rep. 46.

Such also is the effect of the ruling of the court in the case of Chaplin v. Kansas City, 259 Mo. 479, 168 S. W. Rep. 763, where the defendant was held to have the power to condemn an alleyway for a parkway, although the city already owned the public easement. See also Ocean Grove Camp Meeting Asso. v. Public Utility Comrs., 82 N. J. L. 309, 82 Atl. Rep. 306.

We have been impressed with the force of the argument presented by the plaintiffs in error that there is no necessity for the condemnation in this case because the property is already occupied and may be so held from term to term under a lease until the year 1980, but we believe the true rule to be that one to whom is delegated the right to condemn may designate the particular property needed and that the court will not interfere with the selection if it is reasonable and no bad faith is shown.

Neither of these appearing from the record, we feel constrained to conclude that the present tenure under the lease may not be an obstacle in the way of condemnation.

After the proceedings were held before the Circuit Judge to establish the right of the petitioner to condemn and the entry of a final judgment in its favor, a jury was properly sworn to fix the compensation to be paid the owner.

It is argued that error was committed by the trial court in entering the judgment because of the absence of necessary parties, viz.: the City of Miami, the County of Dade and the United States Government, but we find little merit to such contention because we cannot see how much the owner could be affected, inasmuch as the award was based on the value of the whole tract irrespective of the positions held by the sublessees.

Much of the argument in briefs of the plaintiffs in error

is devoted to the contention that the court erred in excluding from consideration by the jury the value of the improvements placed on the property by the petitioner.

It is stipulated in the twelfth paragraph of the lease that:

"All structures, buildings and other facilities and improvements now or hereafter erected or constructed on the demised premises as now or hereafter constituted shall be considered as the personal property of the Lessee and shall be removable at any time by the Lessee, and the title thereto shall be and remain in the Lessee, subject however, to the Lessors' lien for rent and charges as agreed herein provided, however, that this clause shall not apply to retaining sea-walls which do not serve as ramps, or filled in land or accretions to the said premises, any and all of which shall forthwith become a part of the demised premises and be the property of the Lessors in trust as aforesaid.

"Prior to the expiration of the aforementioned demised term, or of any renewal or extension thereof, unless this lease shall be further renewed or extended by the Lessee, and then prior to the expiration of the last period for which this lease is so renewed or extended, or within sixty (60) days after the earlier lawful termination of this lease by the Lessors for any cause, the Lessee after first giving written notice to the Lessors of its intention to remove shall, at its own expense, remove the buildings or other structures, except sea-walls, erected upon said premises by the Lessee, such removal to be done in a skillful and workmanlike manner.

And in the thirteenth paragraph:

"The Lessee shall, however, receive any award (in the event of condemnation) made for the taking of any buildings, structures or other improvements which, under the

provisions hereof, are to remain the property of the Lessee."

This Court in the case of Jacksonville, T. & K. W. Ry. Co. v. Adams, 28 Fla. 631, 10 South. Rep. 465, 14 L. R. A. 533, decided that where a railroad company, having the power of eminent domain, entered upon land without permission and without exercising the power, and erected improvements on the property, the value of the improvements could not be included in estimating the damage sustained by the landowner in proceedings subsequently brought to take the property.

An attempt is made to distinguish between that case and the one at bar on the theory that in the latter no right to condemn existed at the time of the entry under the lease.

We believe that the controlling principle is not the right to condemn but the damage actually sustained by the owner. We cannot comprehend how the value of the improvements placed by the lessee and removable by him, by the very terms of the lease, could be considered by the court in fixing the damages suffered by the owner.

The Supreme Court of the United States held an Act of Congress constitutional which provided that upon condemnation by the government of property held under a lease any improvements constructed by the government should be excepted from the sum payable to the owner under a subsequent condemnation. Old Dominion Land Co. v. U. S., 269 U. S. 55, 70 L. Ed. 162, 46 Sup. Ct. Rep. 39. See Kansas City Southern Ry. Co. v. Second Street Improvement Co., 256 Mo. 386, 166 S. W. Rep. 296; Lewis Eminent Domain, 2nd Ed. Vol. 2, Sec. 507, p. 1142.

It would be illogical to hold that the improvements on the property, placed there by the lessee after an understanding with the owner that they could be removed, would

form an item of loss to the owner for the injury must be, as it is aptly expressed in Lewis on Eminent Domain, "to what the land holder had himself, not to what he had not." Sec. 507; *supra,* p. 1145.

The testimony of the various witnesses introduced by the parties litigant with reference to the value of the property ranged from about $45,000 to $800,000, and from $4500 to 25,000, on the amount of attorney's fees. The verdict of the jury fixed the former value at $135,000 and the latter at $12,000. There was ample testimony to support the verdict, and after an examination of more than one hundred assignments of error and several hundred pages of briefs, we conclude that the trial was fairly conducted; that the Circuit Judge committed no harmful error, and that the judgment of the lower court should not be disturbed.

Affirmed.

TERRELL, C. J., and BROWN and BUFORD, J. J., concur.

WHITFIELD and CHAPMAN, J. J., dissent in part.

WHITFIELD, J. (dissenting in part).—Section 29, Article XVI, of the Florida Constitution, having direct reference to the compensation to be paid for "property * * * appropriated to the use of any corporation or individual" pursuant to the exercise of the power of eminent domain, specifically commands that "no private property nor right of way shall be appropriated" for such use "until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; which compensation irrespective of any benefit from any improvement proposed by such corporation or individual, shall be ascertained by a jury of twelve men in a court of competent jurisdiction, as shall be prescribed by law." The previous Constitution did not contain a section of similar import.

See Journal of the constitutional convention of 1885, pp. 423, 425, 489, 491, 545, 546.

The words, "full compensation" as used in the above organic section, means all the compensation that may legally be awarded under the law applicable to compensation .for private property that is duly appropriated to the use of corporations or individuals when they are duly authorized to exercise the right of eminent domain. "Full compensation" as used in Section 29, Article XVI, is broader and more exact in scope than the words "just compensation" as used in Section 12 of the Declaration of Rights, Florida Constitution. The latter provision has more particular reference to private property "taken" by or for the use of the State or the public through governmental agencies. See Doty v. City of Jacksonville, 106 Fla. 1, 142 So. 599. An ascertained compensation ranging between two *reasonable* maximum and minimum amounts might be "just compensations," yet it might not in every case be "full compensation" or all that the Constitution commands shall be paid as "full compensation" under Section 29, Article XVI. The courts must ultimately determine what is "full compensation" in cases as they arise in the duly authorized exercise of the right of eminent domain by "corporations or individuals." The courts must also protect against excessive awards as "full compensation" in such eminent domain cases.

This court has held that "full compensation" includes "increases in market value in anticipation of the proposed improvements, before the appropriation." Sunday v. L. & N. R. Co., 62 Fla. 395, 57 So. 351.

"The constitutional right to compensation for property taken by eminent domain under Section 29 of Article 16 of the Constitution of the State of Florida is the full and perfect equivalent of the right taken. Monongahela Navi-

gation Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463." City of Jacksonville v. Shaffer, 107 Fla. 367, 144 So. 888. See also County of Hillsborough v. Kensett, 107 Fla. 237 144 So. 393.

The Fifth Amendment to the Constitution of the United States requires "just compensation" in eminent domain cases but such amendment is not controlling in State courts when no Federal rights are being litigated. See Thorington v. Montgomery, 147 U. S. 490, 13 Sup. Ct. 394, 37 L. Ed. 252.

The compensation to which the owner is entitled is the full equivalent of the value of the property appropriated. See 18 Am. Juris., p. 874, *et seq.,* and cases cited as to various phases of the general subject.

Several of the charges given on the subject of compensation for the property appropriated are not entirely in accord with the award of "full compensation" as commanded by the Constitution, and it does not appear from a consideration of the entire evidence that the amount awarded by the verdict is the required "full compensation" for the defendant's property that is to be appropriated to the use of a corporation under Section 29, Article XVI of the Florida Constitution.

Even under the Fifth Amendment to the Federal Constitution "no private property shall be 'appropriated to *public* uses unless a full and exact equivalent for it be returned to the owner." Monongahela Navigation Co. v. United States, 148 U. S. 312, text p. 326, 13 Sup. Ct. 622, 37 L. Ed. 463. See also Olson v. United States, 292 U. S. U. ·S. 246, 54 Sup. Ct. 704, 78 L. Ed. 1236.

CHAPMAN, J., concurs.