## TRUSTEES OF INTERNAL IMPROVEMENT FUND v. MADEIRA BEACH NOMINEE, Inc., et al.

No. 27622.

Circuit Court, Pinellas County.

November 3, 1971.

M. Stephen Turner, Tallahassee, and James T. Russell, Pinellas County State Attorney, for the plaintiff.

Theodore C. Taub of Gibbons, Tucker, McEwen, Smith, Cofer & Taub, Tampa, for the defendant.

Wayne Nelson, St. Petersburg, for third-party defendants Beth and Thomas Huff.

John L. Riley of Riley, Schowe & Saltsman, St. Petersburg, for third-party defendants Joseph and Rosemary Zaleski and N. M. Peruzze.

CHARLES R. HOLLEY, Circuit Judge.

*Final judgment:* This case was heard on motion of Medeira Beach Nominee, Inc. for a summary judgment and on cross-motion of the plaintiff and cross-defendants for summary judgment. Medeira Beach Nominee, Inc.'s objection to consideration of the cross-motion, the defendant not having been allowed twenty days, was overruled because the factual and legal issues of the motions were identical. Having considered the record, stipulations made by counsel in open court and argument of counsel I found there was no genuine issue of a material fact precluding judgment for Medeira Beach Nominee, Inc. on all issues except those of easement, dedication and nuisance framed by counts II, III and IV of plaintiff's cross-claim (counterclaim) in their answer to defendants' cross-claim. Having ordered summary judgment to be entered accordingly and trial of the remaining issues on November 3, 1971, the state on November 1, 1971 voluntarily dismissed its claims under said counts II, III and IV. Therefore what was to be a partial summary judgment disposes of all issues and is rendered as a final judgment.

28

The board of trustees of the internal improvement trust fund of the state of Florida, plaintiff, and the individual members of the board, as cross-defendants and counter — or cross-claimants, and the city of Madeira Beach, a municipal corporation, and any other state, county or city agencies, subdivisions or others exercising control and dominion of sovereign lands and police powers under the aegis of the state of Florida, are found to be the state of Florida for purposes of this case. These various instrumentalities will be referred to as the "state" except when appropriate to name the particular agency.

Medeira Beach Nominee, Inc., defendant and cross-claimant, and its predecessors in title are found to be one for purposes of this order and will be referred to as "Nominee, Inc." except when appropriate to distinguish between them. "Medeira" is the correct spelling of defendant's name.

The undisputed, agreed or stipulated facts and evidence show there is no genuine issue of any of the following material facts —

1.  Sand Key is located in Pinellas County. It is a long, narrow island bounded on the east by Boca Ciega Bay, the Narrows and Clearwater Bay, bounded on the west by the Gulf of Mexico, with its southern end at John's Pass and its northern end at Clearwater Pass.

2.  Nominee, Inc. holds title to a parcel of land located in the city of Madeira Beach on Sand Key. (Medeira Beach Nominee, Inc. actually acquired title from its predecessors in December, 1970.) The northeasterly boundary of this land runs along Gulf Boulevard (S.R. 699) about 378 feet. The northwesterly and southeasterly boundaries extend southwesterly from the Gulf Boulevard boundary to the southwesterly or Gulf of Mexico boundary as shown by various plats and deeds to be the "mean high tide line" or the "waters of" the Gulf of Mexico or words of similar import. As a matter of law Nominee, Inc. holds whatever rights belong to a tidal waters upland owner.

3.  The depth of the land from the road to the mean high tide line has varied from approximately 250 feet to the present approximately 365 feet. At all times a substantial portion of the upland existed.

4.  In September, 1950, a severe hurricane caused extensive land damage all along the Gulf front of Sand Key.

5.  By special act of the legislature, city ordinance and referendum, in 1955 the city of Madeira Beach set in motion and in 1956 commenced construction of a groin (or jetty) program along the city's Gulf front. The initial phase was 37 groins, one in front of Nominee, Inc. land, erected on the beach (below then mean high tide) and extending onto the submerged bottoms, this being

with the consent and approval of the trustees of the internal improvement fund and to be paid for and maintained by city taxes and special assessment. The initial program was completed in 1957. The stated purpose was a beach erosion control project intended to prevent beach erosion.

6. There is no evidence that Nominee, Inc. either protested or agreed to the project. The assessment against the Nominee, Inc. upland was paid.

7. In 1960 and 1961 the state furthered the original project by a jetty and artificial nutriment (pumping in sand) program at and near John's Pass (southern end of Sand Key) with the express and intended purpose of causing accretion along the Gulf beach of Sand Key.

8. Nominee, Inc. has done nothing to cause any accretion to its uplands.

9. There has been substantial accretion to the Nominee, Inc. land since the 1950 hurricane. There is disagreement, but this could be as much as 115 feet of depth. The accreted land is true accretion in that it has been formed gradually and imperceptibly.

10. The parties agree the state projects influenced the process of accretion to the upland. There are substantial issues as to when, where, how much and proximate cause. The state stands on the proposition that but for the groins, jetty and nutriment, the accretion would not have occurred. However these issues do not present a genuine issue of *material* fact because the state cannot prevail even if the fact is that but for the state projects the accretion would not have occurred.

11. In February, 1971, Nominee, Inc. as part of an overall plan and contract for the erection of a Holiday Inn commenced the construction of a seawall set back approximately 65 to 68 feet from the then and present mean high tideline. All required permits and other conditions precedent to meet governmental regulations were met by Nominee, Inc.

The state brought this suit to prevent construction of the seawall on accreted land. The state claims title to the accreted lands which it says but for the state projects would not exist.

Since time immemorial, and as far as I know in all nations of all civilizations recognizing private ownership of land, the sovereign has controlled the water courses for the benefit of all, and only the upland has been subject to private control. Generally this division has applied to both fresh water, because a necessity to life, and salt and fresh water because of commerce, war and police activities. In short, long before our western civilization began the nations conceded to the sovereign control of the streams, lakes and oceans as necessary for the general public's health, safety and welfare.

It is well settled and understood in Florida that all navigable tidal waters and the land under it are owned by the state, the sovereign, but may be deeded to private ownership in the public interest. (See generally Florida Statutes chapters 161 and 253, and Maloney, Plager and Baldwin, *Water Law and Administration, The Florida Experience.*)

As neighboring property owners having entirely different kinds of property based upon different theories of ownership, with the passage of time the respective rights and duties of the upland private land and the sovereign bottoms and waters to each other became more defined and specific. The sovereign holds the bottoms and waters in trust for the use and benefit of the general public and may use them as it deems best to this purpose unless such use is damaging to some private property right, and it may use the bottoms and waters to the incidental damage of private property if the use is reasonably necessary for the general public's health, safety or welfare. The upland owner on the other hand has his riparian rights coextensive with his waterfront, among which are at least those of view of the water, access to the water, use of the water consistent with its use by others, and accretion. These riparian rights are indeed valuable property rights. (Maloney, et al, supra.)

The sovereign, except in the exercise of the police powers, may not encroach upon the rights of the upland, and the upland owner may not encroach upon the rights of the sovereign. Neither may do damage to, misuse or abuse the other's rights. The upland owner is restricted in his use of the water by police regulations and consideration of the use of it by other members of the public. Also the upland owner may not without permission of the sovereign erect structures on the bottoms or otherwise block the free navigability of the surface of the water. The upland owner may be prohibited from fouling and polluting the water. The upland owner may not remove land, minerals or other things from the water or the bottoms without permission of the sovereign, these being the property of the sovereign. (See Maloney, et al, supra.)

As long as there has been private ownership of land, generally the dividing line between the private uplands and the sovereign controlled (or owned) waters and bottoms has been the water's edge (as to non-tidal waters) or the mean high or low tide (as to tidal waters). And for as long as this line has existed, the sovereign has been vexed with problems of accretion (the imperceptible and gradual building of upland by deposit of alluvion by the waters), reliction (or dereliction — land exposed and dry presumably permanently because of gradual recession of the water), erosion (the washing away of the soil), the gradual covering presumably per-

manently of land by rising water, and avulsion (the perceptible and sudden change of a water's course or submergence or washing away or emergence of land). As to lands abutting tidal waters, Florida holds the dividing mark is the mean high tide line. (See Maloney, et al, supra.)

In the Institutes of Justinian it is said —

> "Moreover, the alluvial soil added by a river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase and that is added by alluvion which is added so gradually that no one can perceive how much is added at any one moment of time." Lib. II, tit. 1, sec. 20.

The ancient common law rule as to tidal waters which vests title in alluvion accreted to the upland in the upland owner is the law of Florida. Also the ownership of these accreted lands passes with title to the original upland unless expressly excepted. Mexico Beach Corporation v. St. Joe Paper Company, 97 So.2d 708 (1st D.C.A. Fla. 1957), cert. den., 101 So.2d 817 (Fla. 1958); Ford v. Turner, 142 So.2d 335 (2nd D.C.A. Fla. 1962); American Mortgage Corporation v. Lord, 132 So.2d 40 (2nd D.C.A. Fla. 1961); Municipal Liquidators, Inc. v. Tench, 153 So.2d 728 (2nd D.C.A. Fla. 1963); Siesta Properties, Inc. v. Hart, 122 So.2d 218 (2nd D.C.A. Fla. 1960); Trustees of Internal Improvement Fund v. Toffel, 145 So.2d 737 (2nd D.C.A. Fla. 1962); Feig v. Graves, 100 So.2d 192 (2nd D.C.A. Fla. 1958); Burkart v. City of Fort Lauderdale, 168 So.2d 65 (Fla. 1964); Padgett v. Central & Southern Florida Flood Control District, 178 So.2d 900 (2nd D.C.A. Fla. 1965); 1963 Op. Atty. Gen. 063-50-May 20, 1963; 1958 Op. Atty. Gen. 058-304, November 6, 1958; 1958 Op. Atty. Gen. 058-168-May 23, 1958; 1958 Op. Atty. Gen. 058-255-August 28, 1958.

But to state these basic rules stops far short of our problem.

The first case really landmark and pertinent to our problem is that of St. Clair Co. v. Lovingston, 90 U.S. (23 Wall.) 46, 23 L. ed. 59 (1874), which involved accretions to Mississippi River uplands allegedly "caused wholly by obstructions placed in the river above." The "obstructions" were structures put in by the city of St. Louis with reference to its harbor facilities. The United States Supreme Court defined accretion and held —

> "Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment vests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one."

I have seen no Florida case or other authority directly on this point.

Probably the rule of *Lovingston* is the law of all states of the continental United States except possibly California. Annot. 134 ALR 467, *"Waters: rights in respect of changes by accretion or reliction due to artificial conditions;"* Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 Sup. Ct. Rep. 518 (1890); Solomon v. Sioux City, 51 N.W. 2d 472 (Iowa 1952); Burns v. Forbes, 412 F.2d 995 (3rd Cir. 1969); United States v. State of Washington, 294 F.2d 830 (9th Cir. 1961); Beaver v. United States, 350 F.2d 4 (9th Cir. 1965); Burket v. Krimlofski, 91 N.W. 2d 57 (Neb. 1958); Brundage v. Knox, 117 N.E. 123 (Ill. 1917); Littlefield v. Nelson, 246 F.2d 956 (10th Cir. 1957); Tatum v. City of St. Louis, 28 S.W. 1002 (Mo. 1894); Philadelphia Company v. Stimson, 223 U.S. 570 (1912); Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 80 L.ed. 9 (1935); Borough of Wildwood Crest v. Masciarella, 222 A.2d 138 (Sup.Ct. N.J., Ch. Div., 1966), aff'd 240 A.2d 665 (N.J. 1968).

Even in California where the riparian owner would not be entitled to accretions formed *solely* by artificial means, if the cause is partly natural and partly artificial the general rule applies. Abbott Kinney Company v. City of Los Angeles, 340 P.2d 14 (2nd D.C.A. Calif. 1959).

See also 65 C.J.S., *Navigable Waters,* §§80-82(3); Gay, *"The High Water Mark: Boundary Between Public and Private Lands,"* 18 Univ. Fla. L.Rev. 553; 1 Boyer, *Florida Real Estate Transactions,* §§13.07 - .08, pp. 212-217, §25.08, pp. 651-656, §25.10, p. 660. See also Powell on Real Property, chapter 88, p. 607, et seq.; Thompson on Real Property, chapter 39, p. 599, et seq.; State v. Sause, 342 P.2d 803 (Ore. 1959).

The *Lovingston* rule is consistent with the general body of Florida law and soundly reasoned. I adopt the general proposition that accretions to uplands along navigable tidal waters belong to the riparian owners even though caused in whole or in part by artificial structures.

Counsel for Nominee, Inc. have urged me to merely enunciate this general rule and declare this case governed by it, but to so do would be to ignore the real and vital issue of this case. The law does not operate in a vacuum; it deal with facts. And in no case cited by counsel or known to me applying the *Lovingston* rule has there been present facts raising the issue of this case.

The agreed facts present a question which appears to have no precedent in this country, and counsel have cited no authorities from other countries. I believe the question properly asked is —

"When a sovereign erects structures on sovereign tidal beaches and tidal bottoms for the purpose of preventing erosion of the sovereign beaches and building up abutting private uplands and there is accretion to the uplands by the action of the water which but for such structures would not have occurred, does such accreted land belong to the sovereign?"

In this day of disappearing beaches, vanishing forests, polluted waters and unbreathable air, having been born and reared in a Florida without these conditions I strongly feel they should be corrected. But I have an even deeper-rooted conviction in the rightness of the rule of law. Although some of the basic law I set out in this opinion I do not entirely agree with, it is the undisputed law and the application to it of reason and logic leads to the inescapable conclusion the question posed must be answered in the negative and hold the accreted land belongs to the upland owner.

The *Lovingston* rule is not as broad as it appears. The upland owner may not extend his land through accretion caused by structures erected by him for this purpose. A recently much debated case among conservationists is *Masciarella*, 222 A.2d 138, aff'd 240 A.2d 605. In *Masciarella* it was contended the accretion was caused by the erection by the United States Government of certain stone jetties and the closing (presumably by the United States Government) of a certain inlet, these being actions with reference to navigation. Some limits on the *Lovingston* rule were clearly spelled out by the lower court as follows —

> The reason behind the *Seacoast* decision was that the court was of the opinion that the sole purpose of the mortgagee in repairing the dike was to make land of what otherwise would have been tidal land of the state, and felt that no landowner should be able to enlarge his estate artificially at the expense of the state. * * * This is in line with the weight of authority holding that the owner of land abutting on the water cannot himself extend its limits by producing a condition which causes an accretion to his lands.

On appeal of Masciarella the New Jersey Supreme Court said —

> [The trial judge] held in major effect that, at least here, where the accretion was not the result of any action on the part of the upland owners . . . *nor the result of any project by the state in aid of navigation (or other public project unrelated to shore protection)*, the alluvion was the property of the upland owners. * * * We agree entirely with this holding *and for present purposes need go no further,* while pointing out that the judicial decisions elsewhere assert very broadly that gradual and im-

perceptible accretions belong to the upland owners though they may have been induced by artificial means. (Italics added.)

The first emphasized portion of *Masciarella* is not actually consistent with the facts as I read them in the lower court opinion. Nevertheless it is clear the New Jersey Supreme Court was deliberately refraining from ruling on issues created by facts as they are before me at this time. In our case the state validly exercised its police powers with projects intentionally designed to accomplish exactly what resulted, accretion which but for such projects would not have occurred.

Two general constitutional principles requiring no citations of authorities should be clearly stated at this point: Private property may not be taken for public use without just compensation. No person shall be deprived of his property without due process of law.

A third general proposition is that damage to private property incidental to a valid exercise of police powers is not a taking for public use and is not compensable. State Plant Board v. Smith (1959 Fla.), 110 So.2d 401.

There is a clear and real distinction between a compensable taking and incidental damage. A taking is when a property or right is transferred from the owner to a public agency to be enjoyed by it as its own, whereas the incidental damage by valid exercise of the police power results in destruction of the property or impairing its value. Of course a taking can result either from exercise of a police power or from exercise of the power of eminent domain or even tortiously. State Plant Board v. Smith, supra; White v. Pinellas County (1965 Fla. Appeal), 174 So.2d 88, reh. den., certiorari quashing court of appeal and circuit court (1966 Fla.), 185 So.2d 468.

The just compensation rule is fundamental to our system and present concepts of private property. The incidental damage rule is an exception based upon necessity. State Plant Board v. Smith, supra.

Riparian rights are valuable property rights which cannot be taken by eminent domain or by exercise of the police power without just compensation. Broward v. Mabry (1909) 58 Fla. 398, 50 So. 826; Thiesen v. Gulf, F. & A.R. Co. (1917) 75 Fla. 28, 78 So. 491, LRA 1918 E 718; Brickell v. Trammel (1919) 77 Fla. 544, 82 So. 221; Burkart v. City of Fort Lauderdale (1964 Fla.) 168 So.2d 65; Moore v. State Road Department (1965 Fla. App.) 171 So.2d 25; Padgett v. Southern Florida Flood Control District (1965 Fla. App.) 178 So.2d 900; Kendry v. State Road Department (1968 Fla. App.) 213 So.2d 23.

If the incidental damage rule were applied in this case the result would be to take riparian rights from the upland owner by exercise of the police power and transfer them to the state for public use and benefit without compensation. This would be an invalid exercise of the police power and require me to order inverse condemnation. Kendry v. State Road Department, supra. But application of this rule of necessity is entirely unnecessary in this case to accord complete protection to both the private property and the public interest.

The interest of the public in this case is to prevent erosion and to protect and enhance the public beach. To accomplish this purpose it is unnecessary for the state to acquire title to the accreted uplands. And the power of the state to take property by eminent domain for public use is limited to such property as is necessary for the particular public use. Wilton v. St. Johns County (1929) 98 Fla. 26, 123 So. 527, 65 ALR 488; Central Hanover Bank & Trust Co. v. Pan American Airways, Inc. (1939) 137 Fla. 808, 188 So. 820; Sibley v. Volusia County (1941) 147 Fla. 256, 2 So.2d 578; State ex rel. Erbin v. Jacksonville Expressway Authority (1962 Fla.) 139 So.2d 135; Brest v. Jacksonville Expressway Authority (1967 Fla. App.) 194 So.2d 658, 20 ALR 3d 845, aff'd (Fla.) 202 So.2d 748.

Thus it appears that by holding the accreted land belongs to the upland riparian owner who continues to be the riparian owner a valid exercise of police powers exists, there is no unnecessary taking ordered and the public interest is completely protected.

The reciprocal rights and duties as between the riparian owner and the sovereign were mentioned earlier not merely academically. In Paty v. Palm Beach (1947) 158 Fla. 575, 29 So.2d 363, our Florida Supreme Court held that the washing away of the land of the riparian owner by the changing of the natural action of the ocean which was caused by the erection of bulkheads and seawalls in the ocean by a city under legislative authority is not a taking but an incidental injury. Where the law is that the riparian owner must suffer the incidental damage, in rightness and good conscience he must get the incidental benefit.

A case which used similar reasoning and arrived at a similar conclusion on different facts and different issues of law was State v. Sause (1959 Oregon Supreme Court) 242 Pac. 2d 803, in which the court said —

> The land at the locus in quo, according to the record, has no use and no value except as a means for exacting payment from the upland owner for the benefit of the state. In such a case, in

> balancing the defeasible right of access by the upland owner to navigable waters and his reasonable use thereof, against the interest of the public to the use of the tideland, it is clear that the use of the lands at the locus in quo by the defendants is reasonable and not injurious to the public use. We believe that the above approach to the problem is a reasonable one. It would be anachronistic if the state of Oregon should adopt a rule of law in 1959 which would treat the state as the king of England was treated in his proprietary capacity before the war for independence.

It will be of interest to some that my holding in this case is consistent with the opinion of the Attorney General's Office, 063-50-May 20, 1963, to the city of Deerfield Beach.

The state has suggested credence must be given to §161.051, Florida Statutes, which specifies that "any additions or accretions to the upland caused by the erection of such works or improvements" under permit from the state or by it "shall remain the property of the state if not previously conveyed." §161.191 of the statutes appears to vest in the state previously privately held riparian rights without paying compensation. Neither of these statutes is applicable to the material facts of the case we have here. In the event either of these statutes were applicable, for the reasons above expressed it would be necessary for me to declare them unconstitutional.

The state has also suggested I can award the fee of the accretion to the state but exercise my equitable powers to prevent the state from utilizing the accreted land other than as vacant lands as in the past generally associated with beaches, for the general public's use. It is suggested this would generally accord the upland owner rights substantially the same as before the accretion caused by the state. But how far away from the mean high tide line does the riparian owner have to be before there is a substantial and then a complete destruction of his "waterfront" position? Is it when the Holiday Inn guests have to walk 50 feet or 100 feet or 1,000 feet or 5,000 feet to the beach?

It will be noted the riparian owner has no control over what happens. To fill or not to fill, to erect jetties, groins or other structures is absolutely controlled by the state. The private owner cannot protect his upland from completely washing away by erecting structures below the mean high tide line without the consent of the state. Without consent of or liability to the upland owner, the state can erect structures which cause either erosion of or accretion to the upland. All the citizen has is his riparian rights. If the state wants these rights, the simple and sure way to obtain them is by condemnation.

The state argues it has removed the riparian owner's liability of the possibility of his property eroding away completely. This is simply not the case. There is nothing that assures the private owner the state will forever protect and maintain his upland property. Any person who has resided in Florida for an appreciable time is aware that land near our tidal waters, high, dry and non-riparian yesterday, may be waterfront property tomorrow.

It is thereupon ordered and adjudged that —

(1) Judgment is entered in favor of the defendant, Medeira Beach Nominee, Inc., and against the plaintiffs, Reubin O'D. Askew, Richard B. Stone, Robert L. Shevin, Floyd T. Christian, Doyle Conner, Fred O. Dickinson, Jr. and Thomas D. O'Malley, as and constituting the board of trustees of the internal improvement trust fund of the state of Florida, on all issues framed by plaintiffs' amended complaint, defendant's cross-claim, and count I of plaintiffs' counterclaim, labeled cross-claim, and contained in their answer to defendant's cross-claim.

(2) Medeira Beach Nominee, Inc. is the owner in fee simple of all of the land described in the deeds attached to defendant's cross-claim and incorporated herein by reference, including the property described in exhibit "B" attached to plaintiffs' amended complaint and incorporated herein by reference.

(3) The board of trustees of the internal improvement trust fund of the state of Florida and each member of such board and all persons claiming by, through or under them, or any of them, are perpetually restrained and enjoined from asserting by deed or otherwise any claims, interests, rights or demands against said land or from interfering with defendant's possession, lawful use or disposal thereof, and title to said land is hereby forever quieted and confirmed in Medeira Beach Nominee, Inc.

(4) The westerly boundary of defendant's said land extends to the existing line of mean high tide of the Gulf of Mexico. As of January 19, 1971, such line was as was surveyed and located by C. Fred Deuel, registered surveyor, on January 19, 1971, which survey is incorporated herein by reference.

(5) The third party claim of Medeira Beach Nominee, Inc. against Joseph J. Zaleski, Rosemary A. Zaleski, Natalie M. Peruzze, Beth C. Huff and Thomas O. Huff is dismissed without prejudice.

(6) It is not intended by this judgment to foreclose questions of damage, if any, for wrongful injunction or costs, if any, which are understood to be questions for supplemental proceedings and as to which the court reserves jurisdiction if any.